THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROEL SALINAS, Defendant-Appellant.

First District (4th Division)    No. 1—00—0970

Opinion filed March 31, 2004.

Law Office of Edward A. Burmila, Jr., of Mokena (Edward A. Burmila, Jr., of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, William Toffenetti, and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE QUINN delivered the opinion of the court:

Defendant, Roel Salinas, and two codefendants, Ruben Alvarez and Miguel Martinez, were indicted on two counts of first-degree murder for the shooting death of Arnold Mireles. Defendant was indicted on two additional counts of solicitation of murder for hire and one count of solicitation of murder. Following a simultaneous jury trial consisting of three separate juries, defendant was convicted on two counts of solicitation of murder for hire and sentenced to concurrent 40-year prison terms. Alvarez was convicted of first-degree murder and sentenced to an extended prison term of 80 years and Martinez was convicted of first-degree murder and sentenced to 50 years' imprisonment.

Defendant appeals his conviction and sentence, arguing (1) the State failed to prove him guilty of the offense of solicitation of murder for hire beyond a reasonable doubt; (2) the circuit court committed plain error by allowing the presentation of a portion of testimony in defendant's case before the wrong jury; (3) the circuit court erred by denying his motion to suppress his confession; (4) the admission of Alvarez's confession before defendant's jury was a violation of *Bruton v. United States*, 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968); and (5) he was deprived of a fair trial due to prejudicial remarks by the State during closing argument. For the following reasons, we affirm. We will address defendant's reasonable doubt argument in this opinion. Defendant's other contentions will be addressed in a dispositional order under Supreme Court Rule 23 (166 Ill. 2d R. 23) issued contemporaneously with this opinion.

## BACKGROUND

On the evening of December 29, 1997, Mireles was walking home from work when he was approached from behind and shot once in the back of his head. He died as a result of his wound.

Mireles was a community activist who worked at the Juan Diego

Community Center (the Center), located at 8802 South Exchange Avenue in Chicago. As an employee of the Center, Mireles took photographs of dilapidated buildings and made reports to the housing court in order to have the buildings' owners make the necessary repairs to the properties. Mireles' reports often cited properties owned by defendant, which caused defendant to appear in housing court on many occasions, whereafter he was jailed and ordered to pay fines until his properties were brought into compliance with municipal building codes.

One of defendant's properties that was the focus of Mireles' efforts was located at 8822 South Exchange Avenue. Martinez resided at that address with his wife, Sema, and Alvarez, his close friend. At a December 19, 1997, housing court appearance, defendant presented the court with a handwritten warranty deed dated July 10, 1997, which showed that he conveyed the property to Martinez. Thereafter, Martinez received notices of municipal code violations containing complaints gathered by Mireles, which required him to appear in housing court.

At the hearing on defendant's motion to suppress his confession, Chicago police detectives Michael Baker and William Foster and Chicago police sergeant Michael Kennedy each testified that, on January 15, 1998, they were assigned to investigate the murder of Mireles. Baker, Foster and Kennedy each interviewed defendant at separate times after advising him of his *Miranda* rights, which defendant waived. Baker, Foster and Kennedy consistently testified that they neither hit defendant nor prevented him from sleeping. They did not threaten defendant or promise him that he would only be a witness and not a suspect. Defendant was not shown statements from the codefendants. At no time during the interview did defendant appear to be physically or mentally exhausted. Defendant never asked to speak to an attorney.

Chicago police officer Robert Tovar testified that, on January 15, 1998, at 4:50 p.m., he conducted a polygraph examination of defendant. Prior to the examination, defendant signed a form stating that he voluntarily agreed to take the examination. Following the examination, Tovar confronted defendant with respect to certain issues in which he felt defendant was untruthful. Defendant then provided Tovar with a statement regarding his involvement in the murder of Mireles.

Cook County Assistant State's Attorney (ASA) Robert Milan testified that he and ASA Tom Mahoney interviewed defendant after advising him of his *Miranda* rights. Following the interview, defendant agreed to provide a statement. Defendant signed each of the eight

pages of the statement. Defendant was allowed to make changes to the statement, which he initialed. Defendant also identified and initialed two photographs of codefendants Alvarez and Martinez.

Defendant testified that when he was brought to the police station, he was aware of Mireles' death. Detective Baker slapped defendant in the head three or four times. The interrogating police officers asked defendant if he had paid Martinez to kill Mireles. Defendant asked to speak to his lawyer, but the officers did not allow him to make a telephone call. Defendant testified that he had not slept. ASAs Milan and Mahoney did not advise him of his *Miranda* rights. Milan told defendant that he was only going to be a witness. Milan promised defendant that if he signed some papers, he would be allowed to go home. Defendant read only one or two pages of the "report" that Milan gave him. Defendant then signed the papers because he thought he would be released. Defendant did not tell Milan that Baker hit him.

Following the presentation of evidence and argument, the circuit court denied defendant's motion to suppress his confession.

At trial, the following pertinent evidence was presented to defendant's jury.

Donald Rowans testified that on December 29, 1997, he was with his friend, Michael Quiroz, at Quiroz's residence, located at 8812 South Exchange Avenue. At approximately 11 p.m., Rowans heard one gunshot, whereafter he and Quiroz left Quiroz's apartment. While walking, Rowans saw a man lying facedown on the ground near the corner of 89th Street and Exchange Avenue. Rowans approached the man and observed that he was bleeding and not breathing. Quiroz flagged down a passing car and told the motorist to call the police. After Rowans and Quiroz spoke to the police, Rowans and his girlfriend, Patricia, went to a restaurant where they saw both Alvarez and Martinez. Rowans testified that Alvarez was a member of the Bishops gang. Rowans also testified that Martinez resided at 8822 South Exchange Avenue with Martinez's wife, Sema, and Alvarez.

At the restaurant, Rowans told Alvarez and Martinez that "somebody got killed on the corner." Alvarez and Martinez gave Rowans and Patricia a ride home in Martinez's car. Rowans learned afterward that the deceased was Mireles. Later that night, Rowans and Quiroz went to Martinez's house, where he saw Sema, five other girls and Alvarez's brother, Juan Santo. While there, the police arrived and, again, Rowans spoke to them.

On December 30, 1997, at approximately 6 p.m., Rowans returned to Martinez's house. Alvarez and Rowans then went outside. Alvarez told Rowans to look for a shell casing near Rowans' gangway. Later

than night, Alvarez went to Rowans' apartment. There, Rowans told Alvarez the he heard a gunshot prior to finding Mireles' body and that it sounded like it came from a .38-caliber or .44-caliber weapon. Alvarez responded, "no, it was a 9[-millimeter weapon]." Rowans testified that Alvarez told him the 9-millimeter "was a sweet gun and that he hate[d] to lose it." Alvarez also told Rowans about how he shot Mireles. According to Rowans, Alvarez stated that he had "seen the guy walking down the street, and he ran in the house and grabbed his hood[ie], and he left out and ran back down the street. And he said he was going to shoot him from [Rowans'] gangway but he crept up on him from the back and got within a few feet and shot him." After Alvarez shot Mireles in the head, Mireles fell to his knees and Alvarez turned and ran toward Rowans' apartment. Alvarez's gun jammed, and when he unjammed it, a shell casing fell. Alvarez did not have time to look for the casing and continued running. Alvarez told Rowans that he used a Glock handgun to shoot Mireles and that Mireles "never knew what hit him."

On cross-examination, Rowans testified that he did not know defendant personally at the time of Mireles' murder. Rowans was not a close friend of Alvarez's, but nevertheless, Alvarez confessed to Rowans that he shot Mireles. Alvarez's description of the events conflicted. He had told Rowans that he shot Mireles from a gangway, but also stated that he shot Mireles from close range. Rowans did not challenge Alvarez's separate accounts of the shooting. Alvarez never told Rowans that someone was going to pay him for killing Mireles. Rowans did not know who Mireles was and had never spoken to him. Rowans told police about Alvarez's confession one month after the murder when officers found him and brought him to the police station.

Marvin Wilkins testified that on December 29, 1997, at approximately 11 p.m., he heard a gunshot while sitting in Rowans' living room at 8842 South Exchange Avenue. Wilkins then opened a window in the apartment and saw two men dressed in black, hooded sweaters running from Exchange Avenue toward an alley. Wilkins observed that one man was heavier than the other and that their hands were light in color. Wilkins testified that, when he saw the men running, he did not see a gun in either of the men's hands. According to Wilkins, the men were not African-American. He could not see their faces. Wilkins testified that he believed the two men he saw were either white or Mexican. Wilkins also saw a body lying on the ground at the corner of 89th Street and Exchange Avenue.

Cindy Garcia testified that on December 29, 1997, she resided at 8822 South Exchange Avenue with Martinez, Sema, Alvarez and four

other girls, Rita Bautista, Mabel Rodriguez and Evelyn and Lorena Carbajal. She lived in Martinez's apartment because she ran away from her parents' home. According to Cindy, Alvarez and Little Casper were Bishop gang members. Martinez worked as a roofer. Cindy testified that the building at 8822 South Exchange Avenue was in bad condition. The walls were cracked, there was no heat available and, if Cindy wanted to take a shower, she had to fill up a bucket of water and pour it over herself. Cindy stayed in a second bedroom in the apartment with the four other girls.

Cindy testified that during the evening of December 29, 1997, Martinez and Alvarez left the apartment and returned with food for everyone. Later that night, Martinez and Alvarez entered the second bedroom and took a blanket. Alvarez was wearing black pants and a black "hoodie." Martinez and Alvarez then left the apartment. Fifteen minutes later, Cindy heard one gunshot while sitting in the second bedroom. After another 20 minutes had passed, Martinez and Alvarez returned to the apartment, Alvarez still wearing the same clothing as when he had left. Alvarez entered the second bedroom, returned the blanket and asked the girls for their shoe sizes. He then changed clothes with Rita and left the apartment with Martinez. The girls checked the blanket for bullet holes, but did not find any.

When Martinez and Alvarez returned to the apartment, Evelyn accused Alvarez of killing the man on the corner. Alvarez told her "to shut the fuck up." Cindy testified that several days later, she was with Mabel, Rita and Evelyn when Martinez, Alvarez and Robert Espinoza, also known as Casper, arrived. Alvarez told the girls that "someone was snitching on his name" and that "something was going to happen for whoever snitched."

Rita testified that she was a 17-year-old runaway living with Martinez at 8822 South Exchange Avenue on December 29, 1997. Rita stated that Alvarez was a member of the Bishops gang. While she lived in Martinez's apartment, she never saw either Martinez or Alvarez working to improve the property. She described the poor condition of the property, stating that the house lacked windows, the ceiling was falling, the shower was broken and cockroaches were prevalent. Rita's description of the events that occurred on December 29, 1997, was consistent with Cindy's testimony. Rita exchanged clothes with Alvarez in the bathroom after he determined that she had the largest shoe size among the five girls in Martinez's apartment. When Rita asked Alvarez why he wanted to exchange clothes with her, he told her "just to put them on." Several days later, Alvarez told the girls that he would find out who snitched on him once his lawyer gave him a discovery package and that "something bad might happen" to that

person. Rita also testified that she saw Alvarez carrying a black gun in his waistband "almost every day." She saw the gun a week prior to the shooting and then saw it afterwards at a New Year's Eve party. Rita made an in-court identification of Alvarez's gun. Rita explained that she recognized Alvarez's gun because she had seen it so many times and once had taken it away from him.

Mark Loevy Reyes testified that he is an attorney for the City of Chicago assigned to housing court and that the city had filed numerous building code violation complaints against defendant and the properties he owned. Reyes described the buildings as being in deplorable condition with violations ranging from peeling and lead-based paint, to exposed electrical wiring, missing smoke detectors and collapsing walls and ceilings. Reyes testified that defendant was represented by counsel in most of the matters and that while most, if not all, of the cases were dismissed because defendant made some effort to correct the violations, it was nevertheless necessary to enjoin use of two of the apartment buildings until they became habitable. Reyes stated that Mireles always was present in housing court for defendant's cases and that he was most helpful to the city in pursuing these matters. Defendant once was jailed for nonpayment of fines, with an amount of fines assessed totaling approximately $10,000 to $15,000 at the time of Mireles' death.

Chicago police detective John Murray testified that he was assigned to investigate Mireles' death on January 13, 1998. Murray located Crispin Uvalle and brought him to the police station for questioning. Murray showed Uvalle a photograph of Alvarez. After speaking to Uvalle, Murray attempted to locate Alvarez.

On January 14, 1998, at approximately 4 a.m., Detective Murray proceeded to 8822 South Exchange Avenue, where he spoke to defendant and Sema, who both agreed to be transported to the police station for questioning. Defendant was advised of his *Miranda* rights and was interviewed by Murray and his partner, Detective Bob Rodriguez. Following Martinez's interview, Murray continued searching for Alvarez and the five girls who had lived with Martinez. Murray went to Casper's house in Cicero and, after speaking to Delores Espinoza, Casper's mother, he went to a residence in Cicero located at 1803 South 61st Court. Murray searched a closet in the basement, where he found Alvarez hiding behind clothes. Murray also found a 9-millimeter Glock semiautomatic pistol hidden behind a mirror by the bar. Murray took Alvarez into custody without incident.

Detective Murray testified that he interviewed Alvarez after advising him of his *Miranda* rights. Murray also interviewed Casper, which led to a second conversation with Alvarez. Murray then located and

interviewed Cindy, Rita, Mabel, Lorena and Evelyn at the police station. Following those interviews, Murray contacted the felony review unit of the Cook County State's Attorney's office. Murray also sought the location of defendant. Martinez and Alvarez were charged with first-degree murder in the Mireles case. Murray identified the Glock 9-millimeter semiautomatic pistol and bullets that were loaded into the weapon, which he recovered from 1803 South 61st Court.

Chicago police detective Paul Alfini testified on direct examination that on December 29, 1997, he spoke with Rowans about the shooting. Alfini canvassed the crime scene, but found no physical evidence. Thereafter, Alfini went to Martinez's residence and spoke to both Martinez and Rowans. On January 15, 1998, Alfini spoke to Detective Rodriguez about the status of the investigation in the Mireles case. Alfini then located defendant at his workplace and brought him to the police station for questioning.

Following cross-examination of Detective Alfini before only the Martinez jury, the circuit court excused the Martinez jury and stated, "[o]nly Mr. Alvarez's jury is in the courtroom." The record notes the presence of the Alvarez jury rather than defendant's jury for the continuation of Alfini's testimony; however, the transcript also shows that defendant's attorney cross-examined Alfini.

Detective Alfini continued to testify on direct examination that he was present in an interview room with defendant and Detective Baker. Defendant was advised of his *Miranda* rights, which he waived. Defendant stated that he knew Mireles from previous encounters in court due to building code violations on defendant's properties. Defendant stated that "he had nothing against Arnold Mireles," and that Mireles was "just doing his job." Defendant had sold Martinez his property at 8822 South Exchange Avenue and helped Martinez get a loan. Martinez previously worked for defendant by fixing defendant's buildings. Defendant stated that he did not know Alvarez. Defendant denied any involvement in the murder of Mireles and stated that he had returned from Mexico on January 12, 1998.

Detective Alfini testified that Detective Baker left the interview room, showed a photograph of defendant to Alvarez and returned to defendant's interview room. Defendant again denied that he knew Alvarez.

Defendant's attorney questioned Detective Alfini on cross-examination. Alfini testified that during defendant's interview, he did not show a picture of Alvarez to defendant.

Detective Francis Heslin testified that, on January 15, 1998, he was assigned to investigate the Mireles murder with Detective Kennedy. At 9 a.m. that morning, Heslin interviewed defendant after

advising him of his *Miranda* rights. Defendant waived his rights and stated that the building code violations as reported by Mireles cost him approximately $12,000 to $14,000, including court costs and attorney fees. Defendant never argued with Mireles with respect to the violations. Defendant also told Heslin and Kennedy that he was jailed three times for the violations and eventually was forced to "give away" several of his properties. Defendant stated that from December 26, 1997, to January 6, 1998, he visited his father in Texas.

Officer Tovar testified that, on January 15, 1998, he interviewed defendant after advising him of his *Miranda* rights. Defendant told Tovar that a few days after he returned from Texas, he met with Martinez. Martinez told defendant that "he took care of Mireles," hid the gun and wanted $2,000. Defendant asked Martinez for proof that he killed Mireles and stated that he would "wait until things settle down [to] see what happens." Defendant told Tovar that Martinez threatened Mireles. On December 19, 1997, when defendant was in housing court, Mireles told defendant that he had taken pictures of graffiti on buildings that defendant owns. Defendant told Tovar that as a result of the fines assessed on his properties, he was "going to go bankrupt." Defendant stated that he owed over $85,000 and "now society will pay that." Defendant's daughter spoke to defendant on New Year's Day and told him that "they had killed Arnold Mireles." Defendant told Tovar that the police never found the gun, although detectives told him that the gun was thrown into Lake Michigan. Defendant told Tovar that Martinez hid the gun and that the police would not be able to find it.

Chicago police sergeant Armando Ramirez testified that on January 15, 1998, he and Detective Foster interviewed defendant at 8 p.m. Defendant told Ramirez and Foster that he met with Martinez in September or October 1997 to discuss the problems he was having with Mireles. Martinez told defendant that he would "take care of Mireles" for $2,000. Defendant told Martinez that he would give him $2,000 at Mireles' wake. When Martinez told defendant that he killed Mireles, defendant gave him $50 because he was not sure that Martinez was responsible for Mireles' death and wanted to confirm Martinez's participation. When Ramirez showed defendant a picture of Alvarez, defendant recognized Alvarez and stated that Alvarez worked on his building at 8756 South Houston Avenue during the first week of December. Alvarez told defendant that he would "take care of Mireles" for $2,000. Defendant agreed to pay Alvarez that amount. Ramirez then contacted ASAs Milan and Mahoney.

ASA Milan testified that on January 15, 1998, he and ASA Mahoney interviewed defendant after advising him of his *Miranda* rights,

which defendant waived. Defendant provided a statement to Milan. Milan allowed defendant to read the eight-page statement and make any necessary corrections, additions or deletions. Defendant corrected the statement and signed every page. Also, defendant identified Martinez and Alvarez in two photographs as the individuals he hired to kill Mireles. The statement was published to the jury and included the following.

From 1995 to 1997, Mireles constantly reported defendant for building code violations with respect to the four buildings he owned. In 1995 and 1996, defendant was forced to appear in court every two months. Because of Mireles, defendant lost $8,000 or $9,000 in 1995 and another $9,000 in 1996. Defendant had to pay additional court costs and attorney fees and make necessary repairs to his buildings. Defendant also was jailed for three weeks and sentenced to a week of home confinement. Martinez worked for defendant, specializing in roofing and drywall. A few days before December 13, 1997, defendant was working on the roof of one of his properties with Martinez and Alvarez. While they were working on the roof they discussed the problems Mireles had caused both defendant and Martinez. Defendant sold Martinez his building at 8822 South Exchange Avenue. Defendant knew that Mireles reported violations against Martinez. Alvarez told defendant, "you know who I am, you know what I can do. For two thousand dollars, I can take care of Mireles for you." Defendant knew that Alvarez meant he would kill Mireles if defendant paid him $2,000. Defendant agreed to pay Alvarez $2,000 to kill Mireles. Defendant told Martinez that he would be out of town from December 26, 1997, until the first week of January.

In September or October 1997, Martinez showed defendant rifles in Martinez's apartment. Martinez told defendant that for $2,000, he would "take Mireles out" for him. Defendant told Martinez that he would give him only $1,000 if Martinez killed Mireles. Defendant went to Texas on December 26, 1997, and returned to Chicago on January 6, 1998.

On January 13, 1998, Martinez told Salinas that he "took care of Mireles." Defendant understood that Martinez killed Mireles. Martinez demanded $2,000 from defendant, rubbing his thumb over his fingers when asking for the money. Defendant told Martinez that he would give him $1,000. Martinez said that he needed $2,000 because he had to "take care of someone else." Defendant told Martinez that he was in the process of selling his building and would be able to pay him later. Defendant then gave Martinez $50 to work on his truck. After defendant's confession was admitted into evidence, the State rested.

Martha Grande testified for the defense that on December 29, 1997, she lived at 8850 South Exchange Avenue. At 10:45 p.m., Grande observed from her kitchen window a white, four-door car that parked at the corner of 88th Street and Exchange Avenue. She also saw Mireles walking down the street. When Mireles saw the white car he stopped walking. Grande testified, "the young kid got out and stood in front of him. I don't know what he said to him. And then [Mireles] tried to take a step forward and then he went behind him and that's when he shot him in the head and he fell." Grande then saw the perpetrator run to the corner, where he stood and looked at Mireles. The driver screamed at the shooter twice. The shooter turned around to look at the driver and then ran back to Mireles' body. It appeared the shooter was looking for something because he was moving things around. Grande did not see the shooter take anything. The shooter returned to the car. The tires squealed as the men drove away toward Commercial Avenue.

Grande described the shooter as a short, thin "Puerto Rican type." She stated the driver was fat and wore a black jacket, black hoodie and black gloves. Grande testified that she saw both men outside Sema's house. She did not know their names. Grande knew that the driver was Sema's husband. She recognized his voice.

Grande testified that she told detectives the perpetrators were "both dark complected and that there was one that was short and he was Puerto Rican style." Grande denied that she told detectives that the men were African-American. She stated that she was unsure of whether the shooter wore a red jacket because she was "feeling bad." Grande testified that in a lineup, she had identified two African-American men as the perpetrators. Grande did not identify Martinez and Alvarez because she was afraid they would kill her. Grande did not recognize a photograph of defendant and could not identify him in court. Grande, however, identified Alvarez and Martinez in photographs as the shooter and driver.

Defendant testified that from 1994 to 1998, he owned four buildings located at 8810, 8811 and 8756 South Houston Avenue and 8822 South Exchange Avenue. He testified that he tried to fix the buildings and hired men to help him work on the buildings. Defendant did not have enough money to fix the buildings and was unable to obtain a loan. Defendant lost money on the buildings because he was fined in housing court. Defendant stated that he paid all fines, which totaled $9,000. Defendant knew Mireles from housing court.

Defendant testified that he sold the building located at 8822 South Exchange Avenue to Martinez. When Martinez worked to fix defendant's buildings, he brought "helpers," but defendant did not know

any of the helpers' names. Defendant identified both Martinez and Alvarez in photographs. Defendant stated that he never had a conversation with Alvarez.

In September or October 1997, defendant met with Martinez to discuss how to fix the windows and roofs of the buildings that they owned. Defendant denied that he spoke to either Martinez or Alvarez about killing Mireles. Defendant never heard Martinez complain about Mireles.

On January 15, 1998, defendant was at his place of employment when police officers arrested him. Defendant testified that the police detectives who interviewed him did not advise him of his *Miranda* rights and did not provide him with a waiver form. Defendant asked the detectives if he could make a telephone call, but his request was denied. Defendant stated that Detective Baker hit him in the head three or four times and threatened him. The detectives did not tell defendant that they were investigating Mireles' death. In a second interview, defendant requested a lawyer, but the detectives refused. Again, defendant was not advised of his *Miranda* rights and was not allowed to make a telephone call.

Defendant denied that he confessed his involvement in Mireles' murder to ASAs Milan and Mahoney. Milan did not take a statement from defendant. Instead, Milan already had written the statement and showed it to defendant. Milan did not read the statement to defendant and defendant did not read the statement himself. Milan told defendant that he wanted to help him and that he only wanted defendant to be a witness. Milan told defendant, "[y]ou sign the papers, you go home." Defendant signed every page of the papers that Milan gave him. Defendant stated that Milan made corrections and that defendant initialed them. Defendant denied that he hired someone to kill Mireles.

The parties stipulated that Grande told Detective Ramirez that she saw two black men on the night of December 29, 1997, and that the shooter had wavy hair which was combed back. Grande also told Ramirez that she saw a third black man sitting in the white car. On January 1, 1998, Grande viewed a lineup after which she told detectives that she saw the man in the middle of the lineup in her neighborhood before the night of the homicide. She also told detectives that she had seen the two men she identified in the lineup in the neighborhood before the homicide.

Jeanette Salinas, defendant's daughter, testified that defendant was "always having money problems" and did not have enough money to fix his buildings. Salinas also testified that defendant was in Texas during the New Year's holiday of 1998.

Detective Baker testified in rebuttal that he never hit defendant in the head. He stated that his only interview with defendant lasted 15 to 20 minutes and that he had no further conversations with him.

ASA Milan testified in rebuttal that he never told defendant that he would only be a witness in this case. Milan denied that he wrote out defendant's statement before speaking to him. Milan stated that he did not tell defendant that if he signed the statement, he could go home. Milan testified he read the statement aloud to defendant, word for word, and that defendant took his time and carefully read the entire statement himself.

Following closing argument, the jury found defendant guilty of two counts of solicitation of murder for hire, but found defendant not guilty of first-degree murder and not guilty of solicitation of murder. The circuit court sentenced defendant to concurrent terms of 40 years on each count. After defendant's motion to reconsider was denied, defendant timely appealed.

## I

Defendant initially asserts that the offense of solicitation of murder for hire was not proved beyond a reasonable doubt because the State failed to offer any evidence to corroborate his confession that he procured codefendants Martinez and Alvarez to murder Mireles. Defendant argues that the evidence presented shows only that Martinez and Alvarez murdered Mireles. Defendant maintains that, although he may have had a motive to harm Mireles, this motive provides no corroboration of his confession. Defendant contends that the sole and total evidence showing that he solicited Martinez and Alvarez to murder Mireles came from his confession. Consequently, defendant argues that the State failed to prove the *corpus delicti* of the offense of solicitation of murder for hire.

The State responds that the evidence adduced at trial established both defendant's guilt beyond a reasonable doubt and the *corpus delicti* of the offense of solicitation of murder for hire. The State argues that defendant's motive to solicit willing participants to murder Mireles is established by independent evidence. The State contends that when all the evidence is viewed in the light most favorable to the prosecution, a rational jury clearly could have found the elements of the crime beyond a reasonable doubt.

Defendant, citing *People v. Edwards*, 243 Ill. App. 3d 280, 611 N.E.2d 1196 (1993), argues a *de novo* review is appropriate to determine the issue of whether the State has corroborated his confession to the extent that the *corpus delicti* of the offense of solicitation of murder for hire was proved beyond a reasonable doubt. The *Ed-*

*wards* court, however, did not hold that a *de novo* review is appropriate under these circumstances. Our supreme court has held that, in all criminal cases, the reasonable doubt test as set forth in *People v. Collins*, 106 Ill. 2d 237, 478 N.E.2d 267 (1985), should be applied in reviewing the sufficiency of evidence. *People v. Pintos*, 133 Ill. 2d 286, 291, 549 N.E.2d 344 (1989).

■ In *Collins*, the supreme court held that a conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to defendant's guilt. *Collins*, 106 Ill. 2d at 261; see also *People v. Stiles*, 334 Ill. App. 3d 953, 956, 779 N.E.2d 397 (2002). The relevant inquiry on review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979); *Collins*, 106 Ill. 2d at 261. The trier of fact has the power and duty to determine the credibility of witnesses and the weight to give their testimony, resolve conflicts in the evidence and draw reasonable inferences from the evidence. *People v. Ortiz*, 196 Ill. 2d 236, 259, 752 N.E.2d 410 (2001). It is not the function of this court to retry defendant or to substitute our judgment for that of the trier of fact regarding witness credibility or the weight of the evidence. *Stiles*, 334 Ill. App. 3d at 956.

■ The *corpus delicti* of an offense constitutes an essential element of a criminal prosecution, which consists of two elements: (1) that a certain result occurred; and (2) that some person is criminally responsible for the act. *People v. O'Neil*, 18 Ill. 2d 461, 463, 165 N.E.2d 319 (1960); *People v. Lueder*, 3 Ill. 2d 487, 489, 121 N.E.2d 743 (1954). A person may not be convicted upon his confession alone; the State must prove the *corpus delicti* by independent evidence. *People v. Lambert*, 104 Ill. 2d 375, 378, 472 N.E.2d 427 (1984); *People v. Perfecto*, 26 Ill. 2d 228, 229, 186 N.E.2d 258 (1962). " 'It is enough if the other evidence either tends to show that a crime did in fact occur [citation] or to corroborate the confession.' " *People v. Holmes*, 67 Ill. 2d 236, 240, 367 N.E.2d 663 (1977), quoting *People v. Norcutt*, 44 Ill. 2d 256, 263 (1970).

■ Further, in *People v. Furby*, 138 Ill. 2d 434, 446, 563 N.E.2d 421 (1990), our supreme court explained the concept of proof of guilt for a criminal offense as follows: "By common acceptation, the first two components—the occurrence of the injury or loss, and its causation by criminal conduct—are termed the *corpus delicti*; the identity of the accused as the offender, the ultimate issue, is not considered part of the *corpus delicti*." See also 7 J. Wigmore, Evidence § 2072, at 524-25 (Chadbourn rev. 1978); 1 W. LaFave & A. Scott, Substantive Criminal

Law § 1.4, at 24 (1986). As the identity of the accused as the offender is not part of the *corpus delicti*, logically, the specific offense also is not part of the *corpus delicti*. This is so because the identity of the accused will often determine which specific offense is charged, *e.g.*, whether the offender acted directly or in an inchoate manner (as here), or whether the offender was a family member or was in a position of authority over the victim. Again, we note that the independent evidence need only show that *a* crime occurred, not *the* crime for which the defendant specifically was convicted.

■ The pertinent statutory authority in the present case provides that a person commits the offense of solicitation of murder for hire when, "with the intent that the offense of first degree murder be committed, he procures another to commit that offense pursuant to any contract, agreement, understanding, command or request for money or anything else of value." 720 ILCS 5/8—1.2(a) (West 2002).

The instant defendant's confession established the motive to solicit Martinez and Alvarez to kill Mireles and the method by which Mireles was murdered. Defendant failed to maintain the buildings he owned and, consequently, he was the subject of Mireles' consistent efforts to bring the buildings in compliance with municipal codes. Due to Mireles' efforts, defendant was assessed thousands of dollars in fines and served a three-week jail sentence. To reduce his financial burden, defendant deeded one of his buildings to Martinez. While Martinez and Alvarez worked for defendant, they discussed the problems Mireles had caused. Alvarez told defendant, "you know who I am, you know what I can do." Martinez showed defendant rifles in Martinez's apartment prior to Mireles' death. Defendant confessed that he made agreements with both Martinez and Alvarez to kill Mireles for an agreed amount. Defendant also told Martinez and Alvarez that he would be out of town from December 26, 1997, until the first week of January. Upon defendant's return, Martinez informed defendant that he "took care of Mireles," which defendant understood to mean that Martinez killed Mireles.

■ In this case, the independent evidence not only " 'tends to show that *a* crime did in fact occur' " (emphasis added) (*Holmes*, 67 Ill. 2d at 240, quoting *Norcutt*, 44 Ill. 2d at 263), it conclusively demonstrates that Mireles was shot in the back of the head and died as a result—indeed, this issue was uncontradicted at trial. Consequently, these uncontested facts alone are sufficient independent evidence to prove the *corpus delicti* in this case. The State presented specific, independent evidence showing that "a" crime occurred, which was relevant and directly related to the crime for which defendant was charged, namely, solicitation of murder for hire. Here, "a" crime, as

proven beyond a reasonable doubt by the State, refers to the first-degree murder of Mireles, which was committed by the men defendant procured.

There also is a great deal of evidence that corroborates the confession and, thus, proves the *corpus delicti* in this manner as well.

Defendant himself and several other witnesses testified with respect to defendant's financial and legal problems, stemming from his failure to maintain the buildings he owned. Mireles was the primary figure in bringing charges in housing court against defendant. Other witnesses provided testimony supporting Martinez's and Alvarez's participation in the commission of Mireles' murder. Rowans testified that Alvarez confessed that he shot Mireles with a Glock 9-millimeter handgun. A Glock handgun was recovered when Alvarez was caught hiding in a closet. Perhaps most significantly of all, Grande testified that she saw Alvarez shoot Mireles and saw Martinez yelling to Alvarez and then driving Alvarez from the scene of the murder. Jeanette Salinas corroborated defendant's statement that he was out of town at the time of the murder. In light of the above, defendant's conviction for solicitation of murder for hire was supported by his statement, which in turn was corroborated by independent evidence that tended to confirm his confession.

Defendant argues that for the element of *corpus delicti* to be satisfied, the State must prove that the offense for which a defendant is convicted actually occurred, without considering the defendant's confession. Defendant cites no case law for this proposition. This is not surprising as it is directly contrary to Illinois law. In *People v. Willingham*, 89 Ill. 2d 352, 361, 432 N.E.2d 861 (1982), our supreme court held, "[i]n summation, if the independent evidence tends to prove that an offense occurred, then such evidence, if corroborative of the facts contained in the confession, may be considered *along with the confession* in establishing the *corpus delicti*." (Emphasis added and omitted.)

In *People v. Howard*, 147 Ill. 2d 103, 118, 128-29, 588 N.E.2d 1044 (1991), the defendant confessed to murdering the victim and, in a signed statement provided in the presence of a court stenographer, he admitted borrowing a gun from a friend in order to rob someone, approaching a parked car containing two people whom he planned to rob, and asking the driver for a cigarette and a light. When the driver reached into his pocket, defendant thought he was reaching for a gun and fired two or three shots at the driver. *Howard*, 147 Ill. 2d at 120. The other, unharmed passenger in the car identified the defendant as the shooter and testified at trial that the defendant walked up to their car and shot the driver when the driver refused to give him a match.

*Howard*, 147 Ill. 2d at 118. This witness's testimony, along with other physical evidence, was found to have corroborated the defendant's confession sufficiently and established the *corpus delicti* of the attempted armed robbery charge. *Howard*, 147 Ill. 2d at 127-29.

In *People v. Montes*, 192 Ill. App. 3d 874, 876, 549 N.E.2d 700 (1989), the victim was shot at close range at 1 a.m. on a city sidewalk. The defendant confessed to serving as a lookout as another man attempted to rob the victim and then shot him. Other witnesses testified at trial that they either saw or heard the shooting. *Montes*, 192 Ill. App. 3d at 880. The court held that the evidence independent of the confession sufficiently corroborated defendant's confession of attempted armed robbery, acknowledging that the other testimony did not establish an attempted armed robbery, but reasoned that evidence of a man having been shot to death at 1 a.m., with the shooter fleeing, tended to establish the crime of attempted armed robbery. *Montes*, 192 Ill. App. 3d at 881.

In both *Howard* and *Montes*, the courts held that the State established the *corpus delicti* for attempted armed robbery when each defendant confessed to the crimes of both robbery and murder, although the independent evidence directly corroborated only the portions of the confession relating to the murder charge. Their holdings are consistent with the purpose for requiring independent evidence that corroborates the defendant's confession, which is to ensure that the confession itself is reliable. The other evidence need only tend to confirm a defendant's confession and need not rise to the level of proof beyond a reasonable doubt. *People v. Cloutier*, 156 Ill. 2d 483, 503, 622 N.E.2d 774 (1993).

Defendant's reliance upon *Lambert* and *Lueder* to support his argument is misplaced because each of those cases resulted in a finding that no independent evidence was established either to show that a crime occurred or to corroborate the defendant's confession. *Lambert*, 104 Ill. 2d at 379; *Lueder*, 3 Ill. 2d at 489-90. Defendant also cites *Edwards*; however, there, as in the instant case, the State provided sufficient independent evidence to corroborate the defendant's confession. 243 Ill. App. 3d at 286.

Although defendant later denied his involvement during trial, it is the trier of fact's function to resolve the conflicting testimony. *People v. Campbell*, 146 Ill. 2d 363, 375, 586 N.E.2d 1261 (1992). In this case, the jury was free to credit the testimony of the investigating officers, to accept as true their accounts of defendant's interrogations and to believe the contents of defendant's statement and the corroborating evidence supporting the statement. Viewing all the evidence in the light most favorable to the State, the evidence was not so improbable

or unsatisfactory as to create a reasonable doubt of defendant's guilt. *People v. Howery*, 178 Ill. 2d 1, 38-39, 687 N.E.2d 836 (1997). Indeed, the evidence of defendant's guilt of solicitation of murder for hire is overwhelming.

## II through V

The text of sections II through V is nonpublishable pursuant to Supreme Court Rule 23 (166 Ill. 2d R. 23).

In light of the above, defendant's conviction is affirmed. In addition, the State's motion to assess defendant $100 as costs for defense of this appeal is granted.

Affirmed.

HARTIGAN, J., concurs.

JUSTICE REID, dissenting:

I dissent. Proof of the *corpus delicti* may not depend exclusively on a defendant's extrajudicial confession, admission, or other statement. The defendant's statement must be corroborated with independent evidence which tends to show that the offense occurred. *People v. Wright*, 286 Ill. App. 3d 456, 460 (1996). Proof of an offense requires proof of two concepts: first, that a crime occurred, or the *corpus delicti*, and second, that it was committed by the person charged. *People v. Cloutier*, 156 Ill. 2d 483, 503 (1993), citing *People v. Lambert*, 104 Ill. 2d 375, 378 (1984).

The *corpus delicti* of a crime has two components: (1) proof of the occurrence of *the* injury or loss, and (2) its causation by criminal conduct. *People v. Furby*, 138 Ill. 2d 434, 446 (1990). As stated in *Furby*, "the prosecution must present evidence *aliunde* the defendant's confession that tends to show the commission of *the* offense and is corroborative of the circumstances related in the statement." (Emphasis added.) *Furby*, 138 Ill. 2d at 446, citing *People v. Lambert*, 104 Ill. 2d 375, 378-79 (1984), and *People v. Dalton*, 91 Ill. 2d 22, 29 (1982).

The majority plays with words in an attempt to bolster its opinion. To show the *corpus delicti*, the majority mistakenly maintains that the independent evidence need only prove that *a* crime occurred and not *the* crime for which the defendant was specifically convicted. If that is true, then the majority seems to be suggesting and contending that the *corpus delicti* in this matter could be proved if it could be shown that Salinas, say for instance, violated a traffic law.

*People v. Bounds*, 171 Ill. 2d 1 (1995), is very instructive on this issue. In *Bounds*, the victim was abducted while she was walking to

catch a bus that would take her to work. She was then taken to a nearby building where she was sexually assaulted and later murdered. The defendant argued that the State failed to establish the *corpus delicti* of the offenses of aggravated criminal sexual assault and aggravated kidnapping at trial. The *Bounds* court determined that the State adequately proved the *corpus delicti* for both offenses. *Bounds*, 171 Ill. 2d at 43-46. The *Bounds* court did not, as the majority here suggests, determine that the *corpus delicti* was satisfied with independent evidence of *a* crime occurring. Instead, the *Bounds* court determined that the *corpus delicti* was satisfied with independent evidence that showed that the defendant committed each of the specific crimes for which he was convicted. The *Bounds* court held as follows:

"The evidence independent of the defendant's confession was, we believe, sufficient proof of the *corpus delicti* of the offenses of aggravated criminal sexual assault and aggravated kidnapping. Considering first the charge of aggravated criminal sexual assault, we find that the independent evidence adequately corroborated the details of the defendant's confession and tended to show the occurrence of the offense. \*\*\*
\*\*\*

The defendant also contends that the State failed to introduce sufficient evidence of the *corpus delicti* of aggravated kidnapping. We must reject this argument as well. The evidence here, apart from the defendant's confession, corroborated the details of the defendant's confession and tended to show the commission of this additional offense. \*\*\*
\*\*\*

We believe that the preceding evidence adequately corroborated the defendant's confession and tended to show the occurrence of the crime of aggravated kidnapping. This evidence indicated that the victim was abducted while on her way to work and was taken to a nearby building, where she was sexually assaulted and later murdered. On this record, we find adequate evidence of the *corpus delicti* of aggravated kidnapping." *Bounds*, 171 Ill. 2d at 43-46.

In this matter, Salinas was convicted on two counts of solicitation of murder for hire. In order to prove that a defendant committed the offense of solicitation of murder for hire, the State must establish that the defendant procured another to commit a murder with the intent that the offense of first-degree murder be committed. *People v. Landwer*, 166 Ill. 2d 475, 488 (1995), citing 720 ILCS 5/8—1.2 (West 1992). Here, during the trial, there was substantial evidence which showed that Mireles was murdered. Therefore the only real issue that must be determined is whether Salinas procured someone to kill Mireles.

The State has failed to present sufficient corroborating evidence to

satisfy the *corpus delicti* in this matter. The People may have sufficiently shown that Salinas had a motive to murder Mireles. However, this is insufficient to establish the *corpus delicti*. See *People v. Hougas*, 91 Ill. App. 2d 246, 250 (1968) (motive insufficient to prove *corpus delicti* of arson). In this matter, it is important and must not be forgotten that Salinas was found *not guilty* of first-degree murder.

"The offense of solicitation is complete when the principal offense is commanded, encouraged or requested with the intent that it be committed. *People v. Edwards*, 243 Ill. App. 3d 280, 289, 611 N.E.2d 1196, 1202 (1993) (discussing solicitation to commit murder); see also *People v. Schnurr*, 206 Ill. App. 3d 522, 533, 564 N.E.2d 1336, 1344 (1990). 'Whether or not the actual crime took place is meaningless under the applicable statute. (Ill. Rev. Stat. 1991, ch. 38, par. 8—1 [now 720 ILCS 5/8—1 (West 2000)]). Defendant's offense was complete when the words at issue were spoken ***.' *Edwards*, 243 Ill. App. 3d at 289, 611 N.E.2d at 1202." *People v. Ruppenthal*, 331 Ill. App. 3d 916, 920 (2002). Again, the State and the majority lose sight of the fact that the crime of solicitation of murder for hire is complete at the moment of the solicitation. *Ruppenthal*, 331 Ill. App. 3d at 920.

Here, it is the State's burden to show that Salinas *solicited* his codefendants to kill Mireles for money. In other words, in order to satisfy the *corpus delicti* in this matter, the State must introduce corroborating evidence that a communication occurred between Salinas and his codefendants wherein Salinas requested that they kill Mireles for money. Here, the State has completely failed to do so.

There is no independent evidence in this record which establishes that Salinas procured his codefendants to kill Mireles. The record is devoid of any evidence which shows that Salinas made a statement to either Martinez or Alvarez in which he requested that they kill Mireles for money. Better yet, there is no evidence in the record that shows that Salinas even knew Alvarez. Furthermore, there is no evidence in the record which shows that Salinas paid or attempted to pay Martinez or Alvarez for Mireles' murder.

Instead, the People and the majority suggest that the requisite corroborating evidence to satisfy the *corpus delicti* in this matter can be found in the following circuitous reasoning: Salinas knew Martinez; Salinas and Martinez had a good relationship; Martinez and Alvarez had an extremely close friendship which is evidenced by Alvarez living with Martinez and the two referring to each other as cousins; since Salinas and Martinez were close friends, it is only natural, therefore, that Salinas would have also known Alvarez; Salinas disliked Mireles because of the problems that he was causing him; as a result of Salinas' relationship with Martinez, Salinas informed Martinez and Al-

varez that he disliked Mireles; Martinez in turn, only naturally, offered to help Salinas; Salinas then hired Martinez and Alvarez to kill Mireles. The problem with the State's and majority's reasoning, however, is that this argument is *completely based on speculation* and not corroborating evidence that is found in the record. This does not satisfy the *corpus delicti*.

*People v. Richmond*, 341 Ill. App. 3d 39 (2003), is also instructive. There, the defendant was convicted of two counts of predatory criminal sexual assault of a six-year-old female pursuant to section 12—14.1(a)(1) of the Criminal Code of 1961 (720 ILCS 5/12—14.1(a)(1) (West 1998)). The first count charged contact between the defendant's penis and the victim's anus. The second count charged contact between the defendant's penis and the victim's vagina.

At trial, the victim testified that while she and the defendant were alone, he pulled her shorts down, " 'pulled his thing out,' " and " 'freaked her.' " *Richmond*, 341 Ill. App. 3d at 43. The doctor who examined the victim after the occurrence testified that the victim had a half-moon-shaped tear of her anus which was dilated and consistent with an unlubricated male penis entering her anus. After the defendant was arrested he gave a statement to the police which was consistent with the victim's account in nearly all respects, except for one significant difference. In his statement, the defendant said that before he penetrated the victim's anus, he placed his penis on her vagina and tried to insert it but could not.

On appeal, the defendant argued that the evidence was insufficient to support the conviction on the penis-to-vagina count because the only evidence of that crime came from his statement. In finding that the *corpus delicti* had not been satisfied with regards to the penis-to-vagina count, the *Richmond* court stated:

> "Evidence of contact between [defendant's] penis and [the victim's] vagina came entirely from [defendant's] statement. In fact, the statement's reference to vaginal contact was brief and nonspecific. All the other evidence provided by the State at trial proved only anal penetration. Nothing in the record corroborated the penis-to-vagina portion of [defendant's] statement. We also reject the State's contention that mere proximity between [the victim's] vagina and anus tended to prove his penis also came into contact with her vagina. That is pure speculation." *Richmond*, 341 Ill. App. 3d at 46.

Additionally, the State argues that two statements made by Alvarez and admitted into evidence in Salinas' case establish that there was an agreement between Salinas and his codefendants to kill Mireles.

Shortly after Mireles was murdered, Alvarez and Martinez returned to Martinez' home. At that time, one of the women who was staying with Martinez accused Alvarez of shooting Mireles. In response, Alvarez told her to "shut the fuck up." The second statement occurred when Alvarez asked Rowans to look for a shell casing in his gangway. Alvarez explained to Rowans that after he shot Mireles, he ran through his gangway and while he was there, he unjammed the gun he allegedly used to kill Mireles and a shell casing fell to the ground which he was unable to find at that time.

Alvarez's statements do not satisfy the *corpus delicti* in this matter. Alvarez's statements do not corroborate Salinas' statement in any way or form. The People insist that Alvarez's statements establish the fact that he and Martinez were waiting for payment from Salinas, but conveniently fail to point out where in the record such support can be found. Alvarez's statements fail to mention Salinas, an agreement between him and anyone for that matter to murder Mireles for money, an expectation of payment, an exchange of money, or a promise to pay.

Furthermore, the fact that Salinas was out of town when the murder occurred does not satisfy the *corpus delicti.* Salinas never explicitly said in his confession that he wanted Martinez and Alvarez to kill Mireles during the time that he was out of town. To suggest this as the State does is to broaden the agreement that Salinas gave in his confession.

No independent evidence in this record corroborates Salinas' confession that he procured Alvarez and Martinez to murder Mireles for money. As such, the State has failed to carry its burden of proving the defendant guilty beyond a reasonable doubt. See *People v. Lee*, 151 Ill. App. 3d 510, 531-32 (1986) (no corroborating evidence that defendant committed an armed robbery attempt); *People v. Lesure*, 271 Ill. App. 3d 679, 684 (1995) (no corroborating evidence that defendant who was charged with unlawful use of a weapon by a felon actually possessed a firearm where the trial court suppressed the rifle he confessed to possessing); *People v. Harris*, 333 Ill. App. 3d 741, 751-53 (2002) (no corroborating evidence that defendant who was a convicted sex offender failed to notify police of his change in address within 10 days of moving).