# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Jackson*, 2012 IL App (1st) 092833

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JONATHAN JACKSON, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-09-2833 |
| Filed | June 29, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Based on the evidence and defendant's confession, the State proved beyond a reasonable doubt that defendant committed predatory criminal sexual assault by finger-to-anus contact, and the State did not deprive defendant of a fair trial by prosecutorial misconduct during closing argument, regardless of defendant's contentions that the prosecutor misstated the law, relied on facts not in evidence and appealed to the jury's emotions. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-17765; the Hon. Joseph M. Claps, Judge, presiding. |
| Judgment | Affirmed; mittimus corrected. |

| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Nicole Marie Jones, all of State Appellate Defender's Office, of Chicago, for appellant. |
|---|---|
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Yvette Loizon, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion. |
| | Presiding Justice Quinn and Justice Connors concurred in the judgment and opinion. |

**OPINION**

¶ 1    This appeal arises from a September 21, 2009 judgment entered by the circuit court of Cook County which found the defendant-appellant, Jonathan Jackson (Jackson), guilty of two counts of predatory criminal sexual assault. Jackson was sentenced to 10 years' imprisonment to be served consecutively for each offense. On appeal, Jackson argues that: (1) his conviction for predatory criminal sexual assault on the finger-to-anus count should be reversed because plaintiff-appellee, the People of the State of Illinois (the State), failed to establish the *corpus delicti* of digital penetration of the anus; (2) the State deprived Jackson of a fair trial due to prosecutorial misconduct in the State's closing argument; and (3) this court should correct Jackson's mittimus to reflect three years' mandatory supervised release as imposed by the trial court where the Illinois Department of Corrections (IDOC) modified the term to "3 years to life–to be determined." For the following reasons, we affirm the judgment of the circuit court of Cook County. We order Jackson's mittimus to be corrected.

¶ 2                                      BACKGROUND

¶ 3    Between June 1, 2005 and July 31, 2007, Jackson lived at 10548 S. Maryland Ave., Chicago, Illinois, with his girlfriend Simona Patterson (Simona), Simona's nephews Kentrail Patterson (Kentrail) and Jarrell Patterson (Jarrell), and the victim, Simona's niece, J.P. During this time, Jackson often cared for the children while Simona was at work. Jackson's abuse of J.P. allegedly occurred during 2006 and 2007. At that time, J.P. was eight years old and Jarrell was 11 years old.

¶ 4    Jackson was charged with 10 counts of predatory criminal sexual assault, 16 counts of aggravated criminal sexual assault, and 19 counts of criminal sexual assault for crimes committed against J.P. The State proceeded to trial on five counts of predatory criminal sexual assault of a child, alleging: penis-to-anus contact; mouth-to-anus contact; mouth-to-vagina contact; finger-to-vagina contact; and finger-to-anus contact. Prior to jury

-2-

deliberations, the State *nolle prossed* the counts for penis-to-anus contact and mouth-to-vagina contact.

¶ 5    On September 22, 2008, the trial court conducted a hearing pursuant to section 115-10 of the Illinois Code of Criminal Procedure of 1963 (725 ILCS 5/115-10 (West 2008)). At the hearing, Jarrell testified that J.P. approached him in April 2006 and told him about Jackson's abuse. Jarrell remembered that it was April 2006 because the family had just returned from a vacation in Champaign, Illinois. J.P. climbed into Jarrell's bunk bed and woke him up to tell him that Jackson had done something to her. Jarrell testified that J.P. told him that Jackson would stand in the bathroom with her as she bathed, and would "check" her to make sure she was clean. J.P. told Jarrell that after Jackson "checked" her, he blindfolded her and pulled out his penis. Jarrell testified that during the conversation he was still half asleep and he told J.P. that he would talk to Simona about it in the morning. The next morning, Jarrell told Simona about his conversation with J.P. Jarrell testified that he also asked J.P. to tell him what happened to her again in the morning because he was having trouble remembering what she said. J.P. refused because she did not want to talk about it again. In June 2007, Jarrell began to notice that J.P. was sad and was not acting normal. He asked her repeatedly what was wrong but she refused to tell him. Finally, after the fourth time Jarrell approached her, she began to speak about Jackson's abuse. Jarrell testified that every Friday, Jarrell, his siblings, Simona and Jackson would have "family night" where they would play games. Jarrell testified that J.P. told him that one time after family night, she was lying on the couch while wearing a dress and Jackson put his hand under her dress and began feeling her butt. J.P. also told Jarrell that Jackson started "kissing on her" and put his finger inside her "private part."

¶ 6    Alexandra Levi (Alexandra), forensic interview manager for the Chicago Children's Advocacy Center (Child Advocacy Center), testified that she interviewed J.P. on July 6, 2007. After some preliminary questions, Alexandra asked J.P. what happened to her and if she knew why she was there. J.P. started to become hesitant in answering the questions and said that she told the police that something happened to her body. Alexandra testified that J.P. pointed to her butt and said that Jackson had done something to her. J.P. then became very emotional and Alexandra ended the interview.

¶ 7    Assistant State's Attorney Suzanne Sanders (ASA Sanders) testified that she interviewed J.P. at the Child Advocacy Center on July 25, 2007. J.P. told ASA Sanders that Jackson touched her when she was eight or nine years old. J.P. said that Jackson would come into the bathroom while she was bathing and tell her to hurry up and finish. After J.P. was done bathing, Jackson would take her into Simona's bedroom. ASA Sanders testified that J.P. told her that once she was in Simona's bedroom, Jackson would lay her on the bed, put a towel over her face and eyes, and lick her butt "where the poop came out." J.P. also said that Jackson put his finger inside her butt. J.P. told ASA Sanders that Jackson touched her this way many times, and on another occasion Jackson put "his stuff" in her butt. When ASA Sanders asked J.P. what she meant by using the term "stuff," J.P. pointed to her pelvic area and responded "it's here where my girl part is but it's on the boy." J.P. was able to recall that one of the incidents with Jackson occurred right before a family vacation to Champaign, Illinois. ASA Sanders testified that J.P. also told her about an incident with Jackson one

night while she was watching a movie. J.P. pointed between her legs and said that Jackson licked her "girl part." J.P. said that Jackson did not touch her in any other way during that specific incident.

¶ 8 The court found that the time, content, and circumstances of the statements and testimonies given by Jarrell and Alexandra during the hearing provided sufficient safeguards of reliability. However, the court found that the statements and testimony given by ASA Sanders did not provide sufficient safeguards of reliability. Therefore, the court admitted the statements from Jarrell and Alexandra, but found that the statement from ASA Sanders was not admissible.

¶ 9 On August 4, 2009, a jury trial for this matter commenced in the circuit court of Cook County. Dr. Jill Glick (Dr. Glick), pediatrician and medical director of the child protection team at the University of Chicago, testified as an expert in the areas of pediatric medicine and child sexual abuse. On July 4, 2007, Dr. Glick conducted an examination of J.P. Dr. Glick testified that J.P. looked dysmorphic, meaning that she had abnormal-looking facial features. J.P.'s eyes were wide set, her head was abnormally shaped, she was very thin, and she was communicating at a six-year-old level despite being nine years old at the time of the examination. Because of these factors, Dr. Glick was concerned that J.P. was developmentally delayed.

¶ 10 Dr. Glick also performed a gynecological exam of J.P. and found that there was an absence of hymenal tissue. Dr. Glick testified that she reviewed J.P.'s medical history and stated that J.P. still should have had a hymen at that age. The lack of hymenal tissue indicated to Dr. Glick that J.P. had experienced trauma or sexual abuse. During the gynecological exam, J.P. was extremely cooperative and comfortable, and was able to color in her coloring book. Dr. Glick stated that this behavior was extremely concerning from a behavioral neurodevelopmental standpoint because J.P. did not exhibit any resistance to the examination. Dr. Glick testified that in her expert opinion, J.P.'s vagina had been penetrated by an object. She stated that the object could have been a penis or finger, among other things.

¶ 11 Dr. Glick also found that J.P. had an anal fissure, which was described as an abrasion or scratch. Dr. Glick stated that the anal fissure was "nonspecific," meaning that it was not necessarily caused by abuse. She was unable to determine the date the fissure developed and stated that it could be caused by numerous common activities, including defecation. Dr. Glick testified that based on her entire examination, she could conclude with a reasonable degree of medical certainty that J.P. was sexually abused.

¶ 12 Assistant State's Attorney Martha Kross (ASA Kross) testified that on August 3, 2007, she interviewed Jackson at the Area 2 police station at 727 East 111th Street, Chicago, Illinois. ASA Kross received a page just before midnight, and once she arrived at the police station, she learned that Jackson was in custody for predatory criminal sexual assault. ASA Kross read Jackson his *Miranda* rights and Jackson agreed to talk to her. Jackson told ASA Kross that he had been living with J.P. for three years, and in 2006 he began to stand in the door of the bathroom when she would take a shower. He told ASA Kross that he would then take J.P. into the bedroom, swipe her vagina and buttocks with his fingers, and then smell his fingers to see if she was clean. ASA Kross testified that initially Jackson told her that he

did this to J.P. only once. However, later in the conversation, Jackson admitted doing this 10 times, and by the end of the conversation he admitted to doing it every time she took a shower. Jackson also initially said that he only inserted his fingers into J.P.'s anus and not her vagina, but later said he inserted his fingers into both J.P.'s anus and vagina. ASA Kross testified that Jackson never admitted to licking or putting his mouth on J.P.'s anus or vagina. Jackson also denied inserting his penis into any part of J.P.'s body. Jackson said that he told Simona about what he was doing to J.P. and that she was present on at least one occasion. Jackson denied touching the boys in the same manner he touched J.P. Jackson stated that he was willing to receive counseling for his behavior, but refused to give a handwritten statement memorializing the conversation with ASA Kross. ASA Kross did not take notes while she was speaking to Jackson, but wrote down a summary of their conversation immediately after the interview. ASA Kross noted no intellectual deficit by Jackson and that Jackson was sober during the interview.

¶ 13    At the time of trial, J.P. was 11 years old and testified that she remembered living with Jackson, Simona, Kentrail and Jarrell at 10548 S. Maryland Ave., Chicago, Illinois. J.P. testified that there were things about Jackson that she liked, but also things about Jackson that she did not like. She stated that Jackson was funny when he would put her on top of the refrigerator, but he also beat the children with an extension cord. J.P. testified that one time after "family night," she was sleeping in the dining room. She woke up when she felt Jackson touch her butt from behind using his tongue. J.P. testified that Jackson used his tongue to touch the "poo part" of her butt "where the poo comes out." J.P. testified that Jackson touched her other times while her brothers were in the room and while her mother was at work.

¶ 14    J.P. also testified that Jackson came in the bathroom while she was taking a bath. She said that after she got out of the tub, Jackson touched her "poo part" with his tongue. She said that he never touched her "poo part" with his finger. J.P. testified that Jackson would take her into Simona's room, lay her on the bed, put a towel over her face, and touch her "poo part" with his tongue. She stated that at the same time, Jackson would touch her front private part but she could not remember what part of Jackson's body he used to touch it. J.P. testified that she told Jarrell what Jackson had done to her, but she could not remember the date or what grade she was in when she spoke to Jarrell. J.P. said that Jackson would touch her every time Simona went to work, and that it happened more than two times. J.P. testified that she never felt anything go into her "poo part" or her front private part, but that it hurt when Jackson would touch her. She said that she could not remember how old she was or what grade she was in during family night.

¶ 15    Jarrell testified that in 2006, he lived with Jackson, Simona, Kentrail and J.P. at 10548 S. Maryland Ave., Chicago, Illinois. Jarrell said that on Friday nights, everyone would gather for family night where they would watch movies and play games. Simona was not always able to attend due to her work schedule. Jarrell said that Simona worked four days out of the week from 3 p.m. to 11 p.m. Jarrell testified that one night after family night, Jasmine fell asleep on the couch. Jarrell also fell asleep and woke up to go to his bedroom. Jarrell said that there was a hole in his bedroom wall where an internet cord was fed from his bedroom to the next room. Jarrell could see J.P. asleep on the couch through the hole. Jarrell testified

that he could see Jackson sitting on the couch close to J.P.'s thighs with his hands by J.P.'s butt. Jarrell waited for a while and then went in the room to check on J.P. He then saw Jackson sitting close to J.P.'s feet. Jarrell stated that he had been interviewed many times about the incidents between J.P. and Jackson, but that day at trial was the only day where he mentioned the hole in his bedroom wall.

¶ 16    Jarrell testified that in 2006, the family went to Champaign to visit Jackson's mom. One night after they returned from Champaign, J.P. woke up Jarrell to talk to him about Jackson. The next day, Jarrell asked J.P. to tell him what happened again because he could not remember what she said. Jarrell testified that J.P. said that Jackson blindfolded her with a purple towel and pulled out his penis. Jarrell stated that he noticed that Jackson would go in the bathroom while J.P. was taking a shower, but that Jackson was not acting weird. Jarrell testified that in 2007 he noticed that J.P. was sad and was acting unusual, so he asked her what was wrong. She said nothing was wrong but Jarrell asked her again. J.P. said that Jackson "did it again." Jarrell stated that he told Simona what J.P. told him.

¶ 17    Jarrell testified that J.P. never described what Jackson did to her; however, he was reminded of his testimony at a prior hearing. Jarrell then remembered that in the hearing he said that J.P. told him that Jackson felt her butt and private part. The State asked Jarrell why he said that J.P. never told him about Jackson touching her and he responded "she did tell me." Jarrell testified that he did not remember saying that Jackson put his finger in J.P.'s private part during the prior hearing. Jarrell testified that he never liked Jackson, but that Jackson never touched him or Kentrail. Jarrell also stated that he was "a little" scared of Jackson.

¶ 18    Dr. Jeremy Nicolarsen (Dr. Nicolarsen) testified that on July 3, 2007, he examined J.P. as an intern physician in pediatrics at the University of Chicago. Dr. Nicolarsen noticed that J.P.'s eyes were widely spaced due to a condition called hypertelorism, and that she was short and skinny for her age. Dr. Nicolarsen began asking J.P. questions during his examination, and J.P. told him that someone touched her private parts and put a sheet over her head. When Dr. Nicolarsen asked J.P. to point to the area that she was talking about, J.P. pointed to her vagina. J.P. told Dr. Nicolarsen that she did not know if someone had put his penis in her private part. J.P. also told Dr. Nicolarsen that there was no anal or oral abuse. Dr. Nicolarsen testified that he conducted a physical examination but not a gynecological examination.

¶ 19    The State then entered a *nolle prosequi* on the predatory criminal sexual assault counts for penis-to-anus contact and mouth-to-vagina contact. The State then rested. After the State rested, the defense rested without presenting any evidence. Jackson moved for a directed finding on the three remaining counts and the trial court denied Jackson's motion. Both the State and defense counsel for Jackson presented closing arguments, and the trial court instructed the jury on the three predatory criminal sexual assault counts of mouth-to-anus contact, finger-to-vagina contact, and finger-to-anus contact. The jury returned a verdict of not guilty on the mouth-to-anus count, and returned a verdict of guilty on the finger-to-vagina and finger-to-anus counts. On September 21, 2009, the trial court sentenced Jackson to two consecutive terms of 10 years' imprisonment with 3 years of mandatory supervised release (MSR). On that same day, Jackson filed a notice of appeal and a motion to reconsider his

sentence claiming that: his sentence was excessive; the court improperly considered matters in aggravation that are implicit in the offense; and the State failed to prove eligibility for an enhanced penalty or consecutive sentencing. The trial court denied Jackson's motion to reconsider.

¶ 20                                                    ANALYSIS

¶ 21       We first examine Jackson's argument that his conviction on the finger-to-anus count of predatory criminal sexual assault should be reversed because the State failed to establish the *corpus delicti* of digital penetration of the anus. We note that Jackson did not raise this argument in a posttrial motion. However, error claiming the failure to prove a material allegation of the indictment cannot be forfeited. *People v. Davis*, 173 Ill. App. 3d 300, 303, 527 N.E.2d 552, 554 (1988). Thus, the absence of proof of *corpus delicti* may not be forfeited. *Id*. Therefore, we will consider Jackson's argument.

¶ 22       When considering a challenge to a criminal conviction based on the sufficiency of the evidence, the relevant question on appeal is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Hall*, 194 Ill. 2d 305, 329-30, 743 N.E.2d 521, 536 (2000) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A conviction will only be reversed where the evidence is so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *Id*.

¶ 23       The supreme court has explained *corpus delicti* in the following manner:

     " 'Proof of guilt for a criminal offense may be divided conceptually into proof that an injury or loss occurred, that the cause of the loss was criminal in nature, and that the accused was the offender. [Citation.] By common acceptation, the first two components–the occurrence of the injury or loss, and its causation by criminal conduct–are termed the *corpus delicti*; the identity of the accused as the offender, the ultimate issue, is not considered part of the *corpus delicti*. [Citations.] The elements of an offense must, of course, be proved beyond a reasonable doubt.' " *People v. Nowicki*, 385 Ill. App. 3d 53, 76, 894 N.E.2d 896, 919 (2008) (quoting *People v. Furby*, 138 Ill. 2d 434, 445-46, 563 N.E.2d 421, 425-26 (1990)).

Proof of *corpus delicti* may not rest on the defendant's confession alone; rather, the State must present independent evidence that corroborates the confession. *Nowicki*, 385 Ill. App. 3d at 76, 894 N.E.2d at 919. The independent evidence does not have to prove that an offense occurred beyond a reasonable doubt. *People v. Phillips*, 215 Ill. 2d 554, 576, 831 N.E.2d 574, 587 (2005). "Rather, if the defendant's confession is corroborated, then the confession and the corroboration may be considered together to determine whether the crime, and the fact that the defendant committed it, have been proven beyond a reasonable doubt." *Id*. " 'It is enough if the other evidence either tends to show that a crime did in fact occur [citation] or to corroborate the confession.' " *People v. Holmes*, 67 Ill. 2d 236, 240, 367 N.E.2d 663 (1977) (quoting *People v. Norcutt*, 44 Ill. 2d 256, 263 (1970)). When a defendant confesses to multiple offenses, there must be independent evidence tending to show that the defendant committed each of the offenses for which he was convicted. *People v. Sargent*, 239 Ill. 2d

166, 185, 940 N.E.2d 1045, 1056 (2010).

¶ 24    Jackson argues that the only evidence presented at trial to support either of his convictions was ASA Kross's testimony about her interview with Jackson, Jarrell's testimony at the pretrial hearing and at trial, J.P.'s trial testimony, Dr. Glick's trial testimony, and Dr. Nicolarsen's trial testimony. Jackson argues that aside from his interview with ASA Kross, none of the other witnesses provided evidence that Jackson inserted his finger into J.P.'s anus. A review of the record reveals that the testimony of the witnesses presented the following evidence: J.P. told Jarrell that Jackson was "kissing on her," put his finger in her vagina, felt her buttocks, and blindfolded her and pulled his penis out. On one occasion, Jarrell saw Jackson "sitting close to J.P. with his hands by her butt"; J.P. stated that Jackson put a towel over her face, touched her anus with his tongue, and touched her vagina with an unknown body part; J.P. stated that Jackson never touched her anus with his finger and she did not remember anything going inside her anus or vagina. Dr. Glick testified that she performed a gynecological exam of J.P. and found that there was an absence of hymenal tissue, and that in her expert opinion, J.P.'s vagina had been penetrated by an object; that J.P. had an anal fissure which Dr. Glick described as an "abrasion" or a "scratch" which was healing, and Dr. Glick could not tell its origin; that the anal fissure was "not necessarily caused by abuse"; that J.P. demonstrated behavior during the gynecological exam which was extremely concerning from a behavioral neurodevelopmental standpoint; and that based on her entire examination she could conclude with a reasonable degree of medical certainty that J.P. was sexually abused. ASA Kross testified that Jackson told her, in August of 2007, he lived with J.P. for three years and beginning in 2006, he "swiped" her vagina and anus with his fingers to see if she was clean. ASA Kross testified that Jackson initially asserted that he did so on only one occasion, then admitted doing it 10 times and finally admitted to doing it every time J.P. took a shower. Jackson told ASA Kross that he told J.P.'s mother, Simona, about what he was doing to J.P. and that she was present on at least one occasion. Dr. Nicolarsen testified that J.P. told him that someone put a sheet over her head and touched her vagina, but there had been no oral or anal abuse. This testimony and evidence certainly "tend[ ] to show that a crime did in fact occur." *People v. Holmes*, 67 Ill. 2d at 240, 367 N.E.2d at 665. The trier of fact could therefore consider Jackson's confession in drawing certain inferences regarding Jackson's activity with regard to J.P. and the alleged abuse.

¶ 25    Nevertheless, in support of his argument, Jackson cites numerous cases in which one of the defendant's convictions for sexual assault crimes was reversed due to the State's failure to establish the *corpus delicti* of the crime. In *People v. Richmond*, 341 Ill. App. 3d 39, 791 N.E.2d 1132 (2003), the defendant was convicted of two counts of predatory criminal sexual assault for penis-to-anus contact and penis-to-vagina contact. The evidence presented at trial consisted of: the minor's testimony that the defendant put his penis inside her anus; medical testimony stating that the minor's injuries were consistent with a penis entering the anus; and the defendant's statement that he put his penis in her anus and tried to put his penis in her vagina but was unsuccessful. *Richmond*, 341 Ill. App. 3d at 43-44, 791 N.E.2d at 1136. The appellate court reversed the defendant's predatory criminal sexual assault conviction for the penis-to-vagina count because the only evidence of contact between the defendant's penis and the victim's vagina came entirely from the defendant's statement. *Id.* at 46, 791 N.E.2d

at 1138. The court found that the independent evidence only tended to prove anal contact, and did not corroborate the defendant's statement as to vaginal contact. *Id.* The court rejected the argument that the proximity between the victim's anus and vagina tended to prove that the defendant's penis also came in contact with her vagina. *Id.*

¶ 26      In *People v. Lambert*, 104 Ill. 2d 375, 472 N.E.2d 427 (1984) (*per curiam*), the defendant was convicted of one count of indecent liberties with a child. The evidence presented at trial consisted of: testimony from the victim's mother that the victim and the defendant slept in the basement together and she noticed weeks later that the victim's rectum was pink and swollen; testimony from a police officer with no medical training that examined the victim and stated that the victim's rectum was " 'light redish' "; and testimony from the same police officer that the defendant admitted to fondling the victim's penis and buttocks, sucking the boy's penis, and rubbing his penis against the boy's buttocks. *Lambert*, 104 Ill. 2d at 377-78, 472 N.E.2d at 428. The appellate court reversed the defendant's conviction and the supreme court affirmed. *Id.* at 381, 472 N.E.2d at 430. The court found that there was no medical evidence establishing the causes for the boy's rectal injuries, no evidence of complaints by the boy to his mother, and no evidence outside the defendant's confession concerning sexual activity with the boy. *Id.* at 380, 472 N.E.2d at 429.

¶ 27      In *Sargent*, the defendant was convicted of predatory criminal sexual assault involving J.W., one of his minor stepsons. *Sargent*, 239 Ill. 2d at 181, 940 N.E.2d at 1054. The defendant was also convicted of three counts of predatory criminal sexual assault and two counts of aggravated criminal sexual abuse involving his other stepson, M.G. *Id.* at 169, 940 N.E.2d at 1047. There was ample evidence presented at trial to support the defendant's conviction as to J.W. including multiple interviews with J.W. prior to trial, J.W.'s testimony at trial, and the defendant's statement prior to trial. See generally *Id.* at 171-82, 940 N.E.2d at 1049-54. There was also evidence presented that supported the defendant inserting his finger into M.G.'s anus. *Id.* at 184, 940 N.E.2d at 1056. However, there was no evidence outside the defendant's statement to support the defendant's two convictions for aggravated criminal sexual abuse based on fondling M.G.'s penis. *Id.* When M.G. was interviewed, he could only recall one instance in which the defendant put his finger in M.G.'s anus. *Id.* at 172, 940 N.E.2d 1049. The supreme court reversed the defendant's two convictions of aggravated criminal sexual abuse. *Id.* at 185, 940 N.E.2d at 1056. The court reasoned "[t]here may be circumstances where criminal activity of one type is so closely related to criminal activity of another type that corroboration of one may suffice to corroborate the other, but such circumstances are not present here." *Id.* The court found that each separate act gave rise to a separate charge, and the independent corroborating evidence must relate to the specific events on which the prosecution is predicated. *Id.*

¶ 28      The State argues that the previously mentioned cases differ from the case at bar by highlighting the testimony given by Dr. Glick, Jarrell and J.P. The State argues the cases cited by Jackson, unlike the instant case, did not contain medical evidence or other testimony to corroborate the defendants' confessions. The State claims that although Dr. Glick's testimony established that J.P.'s anal fissure could have been caused by many common activities and was not necessarily caused by abuse, it still corroborates the act of Jackson inserting his finger into J.P.'s anus.

¶ 29 In support of this argument, the State relies on *People v. Darnell*, 94 Ill. App. 3d 830, 419 N.E.2d 384 (1981), in which the defendant's rape conviction was affirmed even though the pathologist who examined the victim found no indications of injury to the victim's genitalia and had no opinion as to whether or not the victim had been raped. The pathologist stated that he could not rule out the possibility of rape. *Darnell*, 94 Ill. App. 3d at 835, 419 N.E.2d at 387. However, the appellate court's ruling in that case was based entirely on other evidence presented at trial. The court found that the two exhibits that corroborated the defendant's confession were a photograph of the defendant's genitalia showing penile abrasions and a photograph of the body of the victim with her shorts pulled down below her buttocks. *Id*. Further, the court stated "[i]n view of the many possible inferences that can be drawn from the pathologist's testimony, we cannot say that his testimony was conclusive of either the occurrence or the nonoccurrence of rape." *Id*. Thus, we are not persuaded by the State's reliance on *Darnell*.

¶ 30 Although we are unpersuaded by the State's reliance on *Darnell*, we find that this case differs from the cases cited by Jackson. In *Richmond*, *Lambert*, and *Sargent*, the State was unable to present *any* evidence that corroborated the defendants' confessions for the convictions that were reversed. However, in this case, Jarrell testified that J.P. told him that Jackson "felt *** her butt," Jarrell saw Jackson sitting close to J.P.'s thighs with "his hands [close to] her butt," and Dr. Glick testified that J.P. had an anal fissure. Jackson argues that contact with the buttocks does not constitute contact with the anus. See *People v. Nibbio*, 180 Ill. App. 3d 513, 517, 536 N.E.2d 113, 117 (1989); *People v. Oliver*, 38 Ill. App. 3d 166, 170, 347 N.E.2d 865, 868 (1976). While this is generally true, we find that Jarrell's testimony tends to support the finding that Jackson committed the act of inserting his finger into J.P.'s anus, to which he confessed. We acknowledge that when asked if Jackson used his finger to touch her "poo part," J.P. responded "no." However, her trial testimony at times was unclear, and it is the duty of the trier of fact to resolve inconsistencies, determine the weight to assign testimony, and draw reasonable inferences therefrom. *People v. Vaughn*, 2011 IL App (1st) 092834, ¶ 24. Therefore, J.P.'s testimony does not negate Jarrell's testimony and that of Dr. Glick. Thus, the inference can be drawn that Jackson had finger-to-anus contact as required by the statute.

¶ 31 Also, we find that Dr. Glick's testimony differs from the pathologist's testimony in *Darnell*. The pathologist in *Darnell* found no injuries to the victim's genitalia; however, Dr. Glick found that J.P. had an anal fissure. Although Dr. Glick testified that the anal fissure *was not necessarily* caused by abuse, she left open the possibility that it could have been. Therefore, when considered in concert with Jarrell's testimony it tends to corroborate Jackson's confession that he inserted his finger into J.P.'s anus. While not overwhelming, Dr. Glick's testimony and Jarrell's testimony constitute independent evidence that corroborates Jackson's confession. The evidence in the instant case is "consistent with the purpose for requiring independent evidence that corroborates the defendant's confession, which is to ensure that the confession itself is reliable." *People v. Salinas*, 347 Ill. App. 3d 867, 883, 807 N.E.2d 1178, 1191 (2004). "[T]he trier of fact is not required to accept any possible explanation compatible with the defendant's innocence and elevate it to the status of reasonable doubt. [Citations.] *** The trial judge, who saw and heard all of the witnesses,

\*\*\* was in a much better position than are we to determine their credibility and the weight to be accorded their testimony." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 229, 920 N.E.2d 233, 243 (2009). Considering this evidence together with Jackson's confession, we hold that the State met its burden of proving that Jackson committed predatory criminal sexual assault for finger-to-anus contact beyond a reasonable doubt. Therefore, the judgment of the circuit court of Cook County as to the finger-to-anus count of predatory criminal sexual assault is affirmed.

¶ 32    We note that the State argues that if Jackson's conviction for the finger-to-anus count of predatory criminal sexual assault is reversed, this court should remand his conviction for the lesser included offense of aggravated criminal sexual assault. However, because we affirm Jackson's conviction, we do not need to address this argument.

¶ 33    We next examine Jackson's argument that his convictions should be reversed because the State deprived him of a fair trial due to prosecutorial misconduct in the State's closing argument. Jackson claims that during its closing argument, the State misstated the law, relied on facts not in evidence, expressed its own opinions about witness credibility, and made inflammatory statements solely to appeal to the jury's emotions. We note, and Jackson concedes, that he did not object at trial to many of the errors he raises on appeal and did not include any of these claims in his posttrial motion. In order to preserve an issue for review on appeal, the defendant must object to the error at trial and include the objection in a posttrial motion. *People v. Basler*, 193 Ill. 2d 545, 549, 740 N.E.2d 1, 3 (2000). The State argues that Jackson has forfeited consideration of these issues on appeal. We agree. However, Jackson argues that this court should review his arguments as to prosecutorial misconduct under the plain error doctrine.

¶ 34    The plain error doctrine allows a reviewing court to consider an unpreserved error when either: "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error; or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007). The first step in assessing whether the plain error doctrine applies is to determine whether any error has occurred in the first place. *Id*., 870 N.E.2d at 411.

¶ 35    We note that we do not find the evidence in this case as to the finger-to-vagina count or finger-to-anus count of predatory criminal sexual assault to be closely balanced. Jackson's confession is supported by: medical evidence from Dr. Glick regarding J.P.'s lack of hymenal tissue, J.P.'s anal fissure, and her medical opinion that J.P. was sexually abused; Jarrell's testimony that J.P. told him that Jackson put his finger in her private part; Jarrell's testimony that J.P. told him that Jackson felt her butt; Jarrell's testimony that he saw Jackson sitting close to J.P.'s thighs with his hands by her butt; Dr. Nicolarsen's testimony that J.P. told him that someone touched her private parts; and J.P.'s testimony that Jackson touched her private part with an unknown body part. Accordingly, we find that the errors alleged by Jackson could not, by themselves, tip the scales of justice against him. Therefore, we will only consider Jackson's arguments as they apply to the second prong of the plain error

doctrine.

¶ 36      We first discuss Jackson's argument that the State committed reversible error when it repeatedly misstated the law as to the definition of penetration. Although a prosecutor is allowed wide latitude during closing argument, a misstatement of law can be grounds for reversal. *People v. Gutirrez*, 205 Ill. App. 3d 231, 265, 564 N.E.2d 850, 872 (1990). However, "[a] misstatement of the law during closing argument does not normally constitute reversible error if the circuit court properly instructs the jury on the law, as counsel's arguments are construed to carry less weight with the jury than do instructions from the circuit court." *People v. Buckley*, 282 Ill. App. 3d 81, 89-90, 668 N.E.2d 1082, 1088 (1996) (citing *People v. Lawler*, 142 Ill. 2d 548, 564-65, 568 N.E.2d 895, 903 (1991)). The test to determine whether the misstatement constituted substantial prejudice to the defendant is whether the jury would have reached a contrary verdict had the misstatement not been made. *Buckley*, 282 Ill. App. 3d at 90, 668 N.E.2d at 1089.

¶ 37      A person commits predatory criminal sexual assault if the accused is over 17 years of age and commits an act of sexual penetration with a victim who is under 13 years of age. 720 ILCS 5/12-14.1(a)(1) (West 2006) (currently at 720 ILCS 5/11-1.40(a)(1)). Sexual penetration means "any contact, however slight, between the sex organ or anus of one person by an object, the sex organ, mouth or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including but not limited to cunnilingus, fellatio or anal penetration." 720 ILCS 5/12-12(f) (West 2006) (currently at 720 ILCS 5/11-0.1). During closing argument, the State defined penetration as follows:

     "ASSISTANT STATE'S ATTORNEY [ASA]: The first thing I want to talk to you about is the definition of sexual penetration and what that means. The law states the term sexual penetration means any contact, however slight, between the sex organ or anus of one person and an object or sex organ or mouth of another person, or intrusion, however slight, of any part of the body of one person into the sex organ or anus of another person.

     [ASA]: What does that mean? Well, the defendant admits to rubbing [J.P.'s] vagina and her anus and sticking his fingers in it. So all we have to prove is that there was penetration, and all penetration means is that there is contact between either his mouth and his finger and some sex organ on [J.P.'s] body, and we have certainly proven that.

     * * *

     [ASA]: [The State must prove that] the defendant intentionally or knowingly committed an act of sexual penetration; to wit, an intrusion of the defendant's finger into [J.P.'s] vagina * * *.

     * * *

     [ASA]: We have to prove that there was an intrusion of the defendant's finger into [J.P.'s] vagina. Again, penetration means contact, however slight * * *.

     * * *

     [ASA]: The next instruction you are going to get is almost identical to the one I just read, except in this case we have to prove that there was sexual penetration; to wit; an

-12-

intrusion of defendant's finger into [J.P.'s] anus."

¶ 38　　Jackson argues that the State confused the correct definition of "penetration" by equating it with the word "contact," and that this sufficiently confused the jury and induced Jackson's conviction. Jackson is correct in that on two occasions, the State incorrectly stated that "penetration" means "contact" regarding the finger-to-vagina count of predatory criminal sexual assault. However, we note that the State initially read the correct definition of "penetration" to the jury. Moreover, the trial court properly instructed the jury on the correct definition of "penetration" and advised the jury that the attorneys' statements were not evidence both before and after closing arguments took place. The trial court also advised the jury that the law that applied to this case was contained within the court's instructions and that the jury must follow those instructions. When determining whether the jury would have reached a contrary verdict had the improper statements not been made, one factor which a reviewing court relies on is whether the evidence is closely balanced. *Buckley*, 282 Ill. App. 3d at 90, 668 N.E.2d at 1089. As previously discussed, we hold that the evidence in this case is not closely balanced. Because the trial court properly instructed the jury on the correct definition of "penetration," we cannot say that the State's improper comments during closing argument were so serious that they affected the fairness of Jackson's trial. Therefore, we hold that the State's comments regarding penetration and contact, although erroneous, do not amount to plain error.

¶ 39　　We next examine Jackson's argument that the State made comments in its closing argument for the sole purpose of appealing to the jury's emotions. Attorneys are allowed wide latitude in making closing arguments. *People v. Clark*, 335 Ill. App. 3d 758, 764, 781 N.E.2d 1126, 1130 (2002). However, a prosecutor cannot make comments that are calculated solely to arouse prejudice and inflame the passions of the jury. *Id*. Jackson attacks the State's repeated references to J.P.'s age and developmental disability when referencing her testimony in closing. In support of his argument, Jackson cites *Clark*, *People v. Liner*, 356 Ill. App. 3d 284, 826 N.E.2d 1274 (2005), and *People v. Carter*, 297 Ill. App. 3d 1028, 697 N.E.2d 895 (1998), to show that references to a victim's age serve no other purpose than to inflame the passions of the jury. However, in all of the cases relied upon by Jackson, the court found reversible error where the age of the victim had no bearing on any issues in the case and the prosecutor was arguing that the victim was a member of a class that needed protection. See *Clark*, 335 Ill. App. 3d at 765, 781 N.E.2d at 1131 (as to armed robbery and home invasion charges, prosecutor's statements in closing argument were improper where prosecutor repeatedly referenced the elderly victim's age and repeatedly argued that the elderly were in a class in need of protection); *Liner*, 356 Ill. App. 3d at 298, 826 N.E.2d at 1287 (prosecutor's statements that jury should make the whole country safe for victims and protect every child in every home in the country were improper in armed robbery and home invasion case); *Carter*, 297 Ill. App. 3d at 1034, 697 N.E.2d at 899-900 (prosecutor's reference to children not being able to have a civilized life was reversible error where there was no evidence that the defendant possessed or sold drugs anywhere in the vicinity of children).

¶ 40　　In this case, J.P.'s age and developmental disability were relevant to the issues at trial. J.P.'s age was a component of the offense of predatory criminal sexual assault, and her

developmental disability was relevant to her ability to testify and communicate in court. Moreover, at no time did the State argue that J.P. was part of a class of citizens that needed extra protection. Thus, the cases relied upon by Jackson are not factually nor analytically similar to this case. Accordingly, we hold that there was no error in the State's references to J.P.'s age or developmental disability in its closing argument.

¶ 41    Jackson also argues that the State infringed upon his right to confrontation when the prosecutor stated four times that J.P. was "forced" to testify and that Jackson made her do so. The State argues that these statements were taken out of context and were merely used to illustrate that J.P. was put in the difficult position of testifying at trial as a result of Jackson's abuse. The State points out that it was explaining J.P.'s difficulty in communicating on the witness stand, not alleging that Jackson was abusing J.P. by exercising his right to trial. The State's argument is reasonable within the factual context of this case. We agree with the State that Jackson's argument regarding the use of the word "forced," is out of context. Because we find that no error occurred in the State's references to J.P.'s age and developmental disability or its use of the word "forced," the plain error doctrine cannot be applied to Jackson's argument that the State's comments were designed solely to inflame the passions of the jury.

¶ 42    We next examine Jackson's argument that the State committed reversible error in its closing argument by asserting facts that were not based on evidence in the record. It is improper for a prosecutor to argue facts not based upon evidence in the case. *People v. Williams*, 333 Ill. App. 3d 204, 214, 775 N.E.2d 104, 113 (2002). As previously stated, a prosecutor is allowed a great deal of latitude in making a closing argument. *People v. Woods*, 2011 IL App (1st) 091959, ¶ 42. The prosecutor is allowed to comment on the evidence and draw all reasonable inferences from the evidence, even if they are unfavorable to the defendant. *Id*. The court must review the entire closing argument and view any alleged erroneous comments in the context they were made. *Id*. Although a prosecutor's comments may be improper, a verdict cannot be disturbed unless the prosecutor's comments resulted in substantial prejudice to the accused, such that without the erroneous comments the verdict would have been different. *Id*. Improper comments alone will not warrant reversal unless they are a material factor in convicting the defendant. *Id*.

¶ 43    Jackson challenges the State's comments asserting that J.P. could not testify about vaginal and anal penetration because those incidents were emotionally and physically painful. Jackson claims that these comments were not reasonable inferences and there was no evidence presented that demonstrated how J.P.'s physical or emotional pain affected her ability to testify. In support of this argument, Jackson cites *People v. Hayes*, 183 Ill. App. 3d 752, 539 N.E.2d 355 (1989), *People v. Barraza*, 303 Ill. App. 3d 794, 708 N.E.2d 1256 (1999), and *People v. Schaefer*, 217 Ill. App. 3d 666, 577 N.E.2d 855 (1991). In the cases cited by Jackson, the court found reversible error where the prosecutors bolstered their closing arguments with personal anecdotes and opinions about the defendant's guilt. While we agree that the State's comments about J.P.'s ability to testify due to physical and emotional pain were improper, they were not substantially prejudicial to Jackson and were not a material factor in his conviction. Thus, although the State's comments were in error, they were not so serious as to affect the fairness of Jackson's trial. Therefore, the State's

comments do not satisfy the second prong of the plain error doctrine.

¶ 44    Jackson also contends that the State's references to J.P.'s fear of Jackson and the courage it took for J.P. to testify constitute reversible error. Specifically, Jackson takes issue with the State's comment; "it must have felt like Mt. Everest to [J.P.] having to walk through this courtroom and climb up that witness stand." Clearly, the statement was hyperbole; however, it did not amount to prejudice. Thus, the comments in question do not satisfy the second prong of the plain error doctrine.

¶ 45    Next, Jackson argues that it was improper for the State to characterize him as a "rapist," a "child molester," a "coward," and "the ultimate villain." A prosecutor may not characterize a defendant as an " 'evil' " person, and cannot influence the jury to make a choice between " 'good and evil.' " *People v. Nicholas*, 218 Ill. 2d 104, 121, 842 N.E.2d 674, 685 (2005). However, "a prosecutor may comment unfavorably on the evil effects of the crime and urge the jury to administer the law without fear, when such argument is based upon competent and pertinent evidence." *Id*. at 121-22, 842 N.E.2d at 685. In support of his argument, Jackson cites *Nicholas*, *People v. Lucas*, 132 Ill. 2d 399, 437, 548 N.E.2d 1003, 1019 (1989), *People v. Johnson*, 119 Ill. 2d 119, 139, 518 N.E.2d 100, 109-10 (1987), *People v. Alexander*, 127 Ill. App. 3d 1007, 1014, 470 N.E.2d 1071, 1077 (1984), and *People v. Williams*, 99 Ill. App. 3d 919, 924, 425 N.E.2d 1321, 1324 (1981). However, in all of the cases cited, the court found that the prosecutors' comments regarding the defendants' "evil" character did not amount to reversible error. Moreover, we find that the references to Jackson as a "rapist" and "child molester" are reasonable inferences drawn from specific acts that Jackson committed. See *Nicholas*, 218 Ill. 2d at 122, 842 N.E.2d at 685. The remaining statements made within the context of closing argument are clearly the prosecutor's opinion and when measured against the instructions given by the court, those isolated statements cannot be said to be substantially prejudicial so as to have denied Jackson a fair trial.

¶ 46    We note that a reviewing court may consider the cumulative impact of a prosecutor's improper remarks in determining reversible error rather than reviewing each improper remark in isolation. *Clark*, 335 Ill. App. 3d at 764, 781 N.E.2d at 1130. However, all of the errors that occurred in this case were minor and did not amount to plain error cumulatively or in isolation. We hold that the errors alleged by Jackson do not satisfy the plain error doctrine.

¶ 47    Alternatively, Jackson claims that the failure to object to the State's prosecutorial misconduct during closing argument constituted ineffective assistance of counsel. In Illinois, claims of ineffective assistance of counsel are governed by the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Land*, 2011 IL App (1st) 101048, ¶ 114-15. In order to satisfy the two-prong test, the defendant must show: (1) that counsel's performance was deficient to the level of being objectively unreasonable under prevailing professional norms; and (2) that the deficient performance prejudiced the defendant so that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. ¶ 115. Jackson argues that his counsel failed to object to a majority of the State's misconduct and failed to include these issues in a posttrial motion so as to preserve them on appeal. During closing argument, counsel for Jackson objected numerous times to the State's comments, including comments referencing Jackson being characterized as a coward, J.P.'s courage in testifying, and J.P.'s lack of ability to

testify about some of the abuse due to the pain she experienced. The evidence in this case was not closely balanced and the errors that occurred at trial were minor. Thus, we cannot say that Jackson's counsel's performance was objectively unreasonable, or that the results of the proceeding would have been different but for counsel's conduct. We hold that Jackson was not denied effective assistance of counsel. Therefore, Jackson's convictions for the finger-to-vagina and finger-to-anus counts of predatory criminal sexual assault are affirmed.

¶ 48     Next, both Jackson and the State assert that the trial court incorrectly credited Jackson with 778 days of time served in pretrial custody instead of 780 days of time served. The parties agree that the court miscalculated the amount of pretrial custody credit Jackson was given, likely because it failed to account for the 2008 leap year and failed to account for the date that Jackson was arrested. A criminal defendant is entitled to sentencing credit for time spent in custody as a result of the offense for which the sentence was imposed. 730 ILCS 5/5-8-7(b) (West 2008). Therefore, we order the mittimus to be corrected to reflect 780 days of pretrial custody credit pursuant to our authority under Illinois Supreme Court Rule 615(b). See *People v. Mitchell*, 234 Ill. App. 3d 912, 921, 601 N.E.2d 916, 922 (1992).

¶ 49     Finally, Jackson argues that this court should correct his mittimus to reflect the sentence that the trial court orally imposed during the sentencing hearing. On September 21, 2009, the trial court sentenced Jackson to two consecutive terms of 10 years' imprisonment with 3 years of mandatory supervised release (MSR). However, the IDOC lists Jackson's term of MSR as "3 yrs to life–to be determined." Jackson argues that the IDOC had no authority to modify the trial court's order and the IDOC's imposition of an indeterminate MSR term is void. Furthermore, Jackson requests that this court correct his mittimus to accurately reflect the trial court's order.

¶ 50     At the time that this appeal was filed, there was a divergence of opinion between the Second and Fourth Districts of the Illinois Appellate Court as to this exact issue. Jackson urged this court to apply the Fourth District standard enunciated in *People v. Rinehart*, 406 Ill. App. 3d 272, 943 N.E.2d 698 (2010), which held that section 5-8-1(d)(4) of the Unified Code of Corrections (Code) (730 ILCS 5/5-8-1(d)(4) (West 2008)) gives trial courts, not the IDOC, the exclusive authority to set a determinate MSR term within the range set by the legislature. On the other hand, the State argues that this court should apply the Second District standard enunciated in *People v. Schneider*, 403 Ill. App. 3d 301, 933 N.E.2d 384 (2010), which found the language of section 5-8-1(d)(4) of the Code to be ambiguous and, through applying the doctrine of *in pari materia*, held that the intent of the legislature in sexual assault cases was to require the court to set a minimum of three years' MSR with a possible maximum of natural life.

¶ 51     However, during the pendency of this appeal, the Illinois Supreme Court recently reversed the Fourth District's decision in *Rinehart*. The supreme court agreed with the Second District's analysis in *Schneider* and found that the legislature intended that there be an indeterminate MSR term in sexual assault cases pursuant to section 5-8-1(d)(4) of the Code. See *People v. Rinehart*, 2012 IL 111719, ¶¶ 23-30.

¶ 52     Accordingly, the IDOC was correct in listing Jackson's MSR term as "3 yrs to life–to be determined." Pursuant to our authority under Rule 615(b), we order that the mittimus be

corrected to reflect an indeterminate MSR term of three years to natural life. See *Mitchell*, 234 Ill. App. 3d at 921, 601 N.E.2d at 922.

¶ 53      We affirm the judgment of the circuit court of Cook County. The mittimus is corrected to reflect 780 days of pretrial custody credit and an indeterminate MSR term of 3 years to natural life.

¶ 54      Affirmed; mittimus corrected.